IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RODNEY TABOR, et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 15-2602 |
| | : | |
| | : | |
| ALLSTATE INSURANCE COMPANY, | : | |
| et al., | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                          December 1, 2015

Currently pending before the Court are: (1) the Motion by Defendants Allstate Insurance

Company, the Allstate Corporation, Agents Pension Plan, and the Administrative Committee

(collectively "Defendants" or "Allstate") to Dismiss certain claims alleged in the Plaintiffs'

Complaint; and (2) the Partial Motion of Defendant Edward M. Liddy ("Liddy") to Dismiss

Plaintiffs' Complaint.  For the following reasons, the Motions are granted in part and denied in

part.[1]

I.     **FACTUAL BACKGROUND**

A.     **Underlying Facts**

The underlying facts are well known to the parties and were summarized in great detail in

the Court's Memorandum Opinion dated February 27, 2014.  In lieu of rehashing the complicated

and convoluted history of this matter, the Court incorporates by reference the recitation of facts

---

[1]  As Liddy's Motion rests on the same grounds as Allstate's Motion, the Court does not
separately address Liddy's Motion, but rather simply grants and denies Liddys' Motion on the
same grounds it grants and denies Allstate's Motion.

set forth in that previous Memorandum.  See Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319 (E.D. Pa. 2014).

By way of brief review, this litigation revolves around Allstate's announcement and implementation of its Preparing for the Future Group Reorganization Program ("the Program"). Prior to November 1999, the majority of Allstate's captive agency force acted as employee agents, under either an R830 or an R1500 contract, and was entitled to a wide range of company-sponsored health, welfare, and retirement benefits.  On November 10, 1999, Allstate announced the Program by noting that, as part of a new business model, it was reorganizing its entire captive agency force into a single exclusive agency independent contractor program.  With few exceptions, Allstate terminated the employment contracts of the 6,200-plus R830 and R1500 employee agents effective no later than June 30, 2000.  While the Program applied to all agents regardless of age, productivity, or performance, approximately ninety percent of the R830/R1500 agents were over forty years of age.

In connection with the termination of the R830 and R1500 employment contracts, Allstate offered the agents working under those contracts four options.  The first three options were conditioned upon the agents' agreement to execute a release of claims, while the fourth option did not.  The first "release-based" option was the "EA Option."  According to the Program Information Booklet, this option would allow the agent to enter into an R3001C or R3001S Agreement, thereby converting the agent from an employee to an Exclusive Agent ("EA") independent contractor.  The agent would then be entitled to all of the benefits and requirements of that contract, including increased renewal commissions, a conversion bonus, earlier transferability in the agent's book of business, debt forgiveness, and reimbursement for moving

2

expenses if necessary.  The R3001 contract, however, did not entitle agents to the same employee benefits.

The second option was the "Sale Option."  This option also permitted an agent to enter into an R3001C/S Agreement with Allstate, thus converting the agent to an EA independent contractor.  In turn, the agent would receive a "conversion bonus" and Allstate would forgive any advances owed, assume certain lease and advertising obligations the agent incurred as an employee agent, and permit the agent, after thirty days' service as an EA, to sell his or her book of business written while an R830 or R1500 agent.  This option also required the agent to sign a release.

The third option was the "Enhanced Severance Option."  Under this option, Allstate would pay the agent "enhanced" severance equal to one year's pay based on the greater of 1997 or 1998 total compensation, forgive debt and/or expenses that Allstate had advanced to the agent, and relieve the agent of certain lease and advertising obligations incurred as an R830 or R1500 agent.  This option was unavailable unless the agent signed a release.

The final option was the "Base Severance Option."  If an agent elected this option, then Allstate paid him or her up to thirteen weeks of pay.  The agent electing this option did not need to enter into a release, although he/she was subject to certain additional non-compete and non-solicitation obligations.  Notably, Allstate had determined that agents affected by the Program were ineligible for the pre-existing severance or post-termination pay plans because they were not terminated for any of the reasons set forth in those plans.  Allstate also took the position that the pre-existing severance/post-termination pay plans were inapplicable because they did not apply to group reorganization programs.

3

The release required by the first three options (the "Release") was three pages long, including a signature page.  The Release and Waiver Provision stated, in pertinent part:

> I hereby release, waive, and forever discharge Allstate Insurance Company . . . from any and all liability . . . or claims for relief or remuneration of any kind whatsoever . . . arising out of, connected with, or related to, my employment and/or the termination of my employment and my R830 or R1500 Agent Agreement with Allstate, or my transition to independent contractor status, including, but not limited to . . . any claim for age or other types of discrimination prohibited under the Age Discrimination in Employment Act of 1967 . . . the Employee Retirement Income Security Act ("ERISA") . . . or any other federal, state, or local law or ordinance or the common law.

(Compl ¶ 88.)

### B.    Procedural Background

Several employee agents subject to this Program brought age discrimination charges against Allstate with the Equal Employment Opportunity Commission ("EEOC").  On August 1, 2001, thirty-two employee agents (the "Romero Plaintiffs")  filed a putative class action complaint against Allstate in connection with the Program.  The Romero Plaintiffs filed their First Amended Complaint on October 18, 2001, and their Second Amended Complaint on July 28, 2010.  On February 27, 2014, this Court ruled on the parties' cross-motions for summary judgment regarding the validity of the Release and held that a genuine issue of fact remained as to whether the Release was knowingly and voluntarily signed.  Thereafter, following the October 6, 2014 denial of class certification on issues regarding the validity of the Release, the Court determined that the statute of limitations for the non-party employee agents resumed running and that they were required to file an action in order to pursue their claims.

On May 11, 2015, ten new Release-signers (the "Tabor Plaintiffs") filed a Complaint and subsequently moved to intervene.  This Complaint brings the following causes of action: (1) a

request for declaratory judgment on the invalidity of the Release under ERISA, the ADEA, and common law (Count I); (2) breach of the R830 contract (Count II); (3) breach of the R1500 contract (Count III); (4) interference with employment and retaliation in violation of Section 510 of ERISA (Count IV); (5) discriminatory termination and retaliation in violation of 29 U.S.C. § 623(a) and (d) (Count V);[2] (6) breach of fiduciary duty (Count VI); (7) cutback of "beefed up" early retirement benefits in violation of 29 U.S.C. § 1054(g)(2) (Count VIII); and (8) cutback of early retirement benefits in violation of 29 U.S.C. § 1054(g) (Count IX).[3]  The Tabor Plaintiffs thereafter moved to intervene in the Romero v. Allstate matter, Civil Action No. 01-3894, and, on September 21, 2015, the Court granted the Motion to Intervene.

On July 27, 2015, Defendants Allstate and Liddy filed Motions to Dismiss the Tabor Plaintiffs' Complaint.  All Plaintiffs submitted a response on August 27, 2015, and on September 17, 2015, Allstate and Liddy filed Reply Briefs.  The Motions are ripe for judicial consideration.

## II.     STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to

---

[2]  Notably, in numbering their causes of action, Plaintiffs skip Count Seven and entitle the seventh and eighth causes of action listed above as "Count VIII" and "Count IX."

[3]  Plaintiffs' Complaint alleges, in the heading of Count V, "discriminatory termination and retaliation in violation of 29 U.S.C. § 623(a) and (d)."  As Defendants note, none of the paragraphs under this Count discuss retaliation.  Nonetheless, to the extent Plaintiffs intend to assert a retaliation claim, those claims are dismissed for the reasons set forth in this Court's opinion in Romero v. Allstate Ins. Co., 3 F. Supp. 3d 313 (E.D. Pa. 2014) and as affirmed by the Third Circuit in EEOC v. Allstate Ins. Co., 778 F.3d 444, 452 (3d Cir. 2015).

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008

WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations.  Phillips, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

Defendants currently seek dismissal of several of the claims set forth in the Tabor Complaint.  First, they ask that the Court dismiss all state law claims (Counts II–III and VI) because Plaintiffs have ratified the Release as a matter of law.  Second, they contend that the breach of contract claims in Counts II and III should be dismissed because each Plaintiff was an at-will employee.  Third, Defendants seek dismissal of all claims under ERISA § 510 (Count IV) because they are barred by the applicable statute of limitations.  Fourth, Defendants contend that all claims under ERISA § 204 (Counts VIII-IX) fail to state a claim because Plaintiffs do not plead that the challenged Pension Plan amendments cut back already accrued benefits.  Finally, Defendants seek dismissal of the breach of fiduciary duty claim (Count VI) because it is barred by the applicable statute of limitations and is inconsistent with Plaintiffs' status as at-will employees.  The Court considers each argument individually.

### A.   Whether the Court Should Dismiss All State Law Claims Because Plaintiffs Have Ratified the Release as a Matter of Law

Defendants first allege that Plaintiffs in this case have failed to return—or even offer to

return—the consideration they each received in exchange for signing the Release.  By neglecting to do so, Plaintiffs have purportedly ratified the Release, thereby waiving their state law breach-of-contract and breach-of-fiduciary duty claims.

The tender-back rule is a principle of contract law.  According to this precept, if a party signs a contract releasing claims in exchange for consideration, the tender back of that consideration is an absolute prerequisite to avoidance of the release.  See 17A Am.Jur.2d Contracts § 574 ("[T]he general rule is that a party who wishes to rescind a contract must return the opposite party to the status quo.").  Tennessee law[4] requires the tender back of the consideration for the release within a reasonable time after discovering the alleged fraud if a party wishes to rescind and repudiate the release.  Mackey v. Judy's Foods, Inc., 867 F.2d 325, 329 (6th Cir. 1989) (citing Cordell v. Sky Rides of Am., Inc., 404 S.W.2d 488, 489 (Tenn. 1966)); see also  Dobbins v. Dabbs, No. Civ.A.2006-00322, 2007 WL 187960, at *9 (Tenn. Ct. App. 2007) (stating that return or tender of consideration for release or compromise is a condition in action for recission or cancellation, action upon original claim, or action for damages sustained by the fraud inducing the release or compromise)).  "[T]ender or payment must be made so soon as the plaintiff asks the court to set aside the agreement; and he cannot be permitted to proceed with the original consideration in his hands, and test the judgment of the court whether he shall receive more.  It is not a question of damage to the defendant, but of the right of the plaintiff to proceed." Patterson v. Bivins, No. Civ.A.97-70, 1987 WL 14828, at *5–6 (Tenn. App. 1987) (citing Tuck v. Payne, 6 Smith 192 (Tenn. 1929)); see also 66 Am. Jur. 2d

---

[4]  All Plaintiffs in this action reside in Tennessee.  As such, the Court finds, and neither party disputes, that choice-of-law rules of Pennsylvania, the forum state, would apply Tennessee law to the state claims at issue.

Release § 57 (2d ed. 1973) (holding, under the tender-back requirement, that "one who seeks to avoid the effect of a release must first return or tender the consideration paid him in connection with his execution of the release").  The Tennessee Supreme Court has held that offering a credit on a potential recovery does not satisfy the tender requirement because there may never be anything due a plaintiff on the original claim.  Lane v. Dayton Coal & Iron Co., 48 S.W. 1094 (Tenn. 1899).

A related concept is the doctrine of contractual ratification, which "is the enforcement of a promise to perform all or part of an antecedent contract of the promisor, previously voidable to him, but not avoided prior to the making of the promise."  Wamsley v. Champlin Refining & Chems., Inc., 11 F.3d 534, 538 (5th Cir. 1993) (citing Restatement (Second) of Contracts § 85 (1981)).  "The theory of ratification is that a promise can be enforced even though the underlying contract is voidable if it is ratified by the promisor."  Jakimas v. Hoffmann-La Roche, Inc., 485 F.3d 770, 782 (3d Cir. 2007); see also Hinton v. Robinson, 364 S.W.2d 97 (Tenn. App. 1962) (holding that a voidable contract is subject to ratification).  If a tender or offer of tender comes too late in an action, then the party seeking to avoid the release is estopped from rescinding that contract and is deemed to have ratified it.  Memphis St. Ry. Co. v. Giardino, 92 S.W. 855, 858 (Tenn. 1906).  According to the Restatement, the determination of what constitutes a reasonable time to tender back consideration before a party is deemed to have ratified a contract is informed by the following factors:

> (a) the extent to which the delay enabled or might have enabled the party with the power of avoidance to speculate at the other party's risk;
> (b) the extent to which the delay resulted or might have resulted in justifiable reliance by the other party or by third persons;
> (c) the extent to which the ground for avoidance was the result of any fault by either party; and

9

(d) the extent to which the other party's conduct contributed to the delay.

Restatement (Second) Contracts § 381(3) (1981).  Indeed, the Restatement advises that, in light of the foregoing, "what time is reasonable depends on all the circumstances, including the extent to which the delay was or was likely to be prejudicial to the other party or to third persons."  Id. cmt. a.

Notwithstanding the clarity of these state law principles' application to state law claims, it remains well established under federal law that a plaintiff's failure to return the consideration received for a release cannot constitute ratification of the release as to ADEA or ERISA claims. Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426–27 (1998); Long v. Sears Roebuck & Co., 105 F.3d 1529, 1542–43 (3d Cir. 1997).  Underlying this principle are the notions that federal statutes are remedial and that plaintiffs should not be deterred from bringing meritorious claims. Jakimas, 485 F.3d at 784.

In light of this jurisprudence, Allstate does not challenge Plaintiffs' federal law claims under the tender-back and ratification doctrines, but rather asserts that Plaintiffs have ratified the Release with respect to their *state* law claims by failing to tender back the consideration received. As this Court previously found, Plaintiffs clearly received consideration for signing the Release, which included some or all of the following: opportunity to become an independent contractor with Allstate, conversion bonuses, vested interests in books of business previously wholly owned by Allstate, forgiveness of outstanding office expense allowance advancements, and enhanced severance payments.  While Plaintiffs seek to rescind that Release on multiple state law grounds and bring claims that are otherwise encompassed by the Release, they have not returned the consideration received, and thus have obtained the benefit of two remedies.  The Releases were

10

signed by June 2000 and, within the ensuing months, many employee agents filed EEOC charges challenging the Release.  The current Plaintiffs were tentatively part of the class that the <u>Romero</u> Plaintiffs sought to have certified, and filed their action only after the Court denied class certification.  Yet, despite the passage of fifteen years from the date the Releases were signed, there has been neither a tender of consideration nor an offer to immediately return all, or at least some, of the consideration received for signing the Release.  Allstate, in turn, has spent years litigating the state law claims having never received either the benefit of the bargain under the Release or the consideration it paid for that bargain.  Under the factors set forth in the Restatement, as well as basic principles of state contract law, the Court must find that Plaintiffs' failure to tender back the consideration received in exchange for signing the Released now constitutes a ratification of those Releases as it respects the state law claims of breach of contract and breach of fiduciary duty.

In an effort to avoid dismissal of their state law claims, Plaintiffs set forth several arguments in opposition.  First, they contend that because the case involves challenges to the Release under both state common law and federal remedial statutes, tender-back and ratification doctrines do not apply.  Second, they assert that ratification does not automatically occur through non-tender back.  Finally, they claim that Defendants are really arguing that there has been a "novation" and not a "ratification."  The Court addresses each argument separately.

### 1.     Whether Ratification Can Bar State Law Claims Where the Federal Law Claims Are Unaffected

Plaintiffs' primary contention asserts that because the case involves challenges to the Release under both state and federal law, and because the federal law challenges are not subject

to any tender back requirements, "one cannot determine the 'consideration' that should be

'allocated' to the state law claims in particular and then tendered back to avoid ratifying *that part*

of the release."  (Pls.' Resp. Opp'n Mot. Dismiss 4 (emphasis in original).)  The Court disagrees.

In support of their assertion, Plaintiffs rely heavily on Jakimas v. Hoffmann-La Roche,

Inc., 485 F.3d 770, 782 (3d Cir. 2007).  That case, however, did not directly address whether the

tender-back rule should be disregarded in cases involving both federal claims not subject to

tender-back and state law claims that are subject to tender-back.  Rather, without expressly

addressing the state law claims at issue in that case, the Court rejected the application of the

tender-back rule to the plaintiffs' claims under § 510 of ERISA on the same grounds that the

tender-back rule has been rejected with respect to other federal statutory claims under the ADEA

and FELA.  Id. at 783–84.  Nothing in that decision suggested that state law tender-

back/ratification rules should not apply to state law claims simply because federal law claims are

brought in the same action.

By contrast, numerous cases have found that a plaintiff's failure to tender back

consideration can act as a ratification of the contract/release as to the state law claims without

acting as a ratification of the contract/release as to the federal law claims.  See, e.g., Bennett v.

Coors Brewing Co., 189 F.3d 1221, 1234 (10th Cir. 1999) (holding that while the appellants'

failure to tender back their severance benefits had no effect on their ability to challenge the

waivers of their ADEA claims under the OWBPA, their retention of severance benefits acted as a

ratification with respect to their state law claims); Long v. Sears Roebuck & Co., 105 F.3d 1529,

1545 (3d Cir. 1997) (recognizing that although the tender-back/ratification doctrines do not apply

to releases challenged under the ADEA, they do apply to the state law claims); Loden v. Blue

Cross & Blue Shield of Okla., No. Civ.A.11-673, 2013 WL 5207238, at *7 (N.D. Okla. Sept. 13, 2013) (finding that the tender-back requirement was a condition precedent for plaintiff to avoid enforcement of the waiver provision of a separation agreement and to bring state law claims for wrongful termination, even though tender-back did not apply to federal law claims under the ADEA); Larkins v. Reg'l Elite Airline Servs., LLC, No. Civ.A.12-139, 2013 WL 1818528, at *5–6 (S.D. Ohio Apr. 29, 2013) ("Because Larkins failed to tender back the payment he received as part of his signing of the Release, he is barred from bringing his claims for race discrimination, fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, and conspiracy. However, Larkins is not barred from bringing his claim under the ADEA."); Duval v. Callaway Golf Ball Operations, Inc., 501 F. Supp. 2d 254, 263–65 (D. Mass. 2007) (dismissing state law claim because the plaintiff's failure to tender back consideration constituted ratification of an agreement, but declining to similarly dismiss the ADEA claim given the dictates of Oubre); Gascho. v. Scheurer, 589 F. Supp. 2d 884, 891 (E.D. Mich. 2008) (finding state law claims ratified for failure to tender back consideration prior to bringing suit, but allowing Title VII claims to proceed because tender-back rules did not foreclose such claims); Halstead v. Am. Int'l Grp., Inc., No. Civ.A.04-815, 2005 WL 885200, at *2 (D. Del. Mar. 11, 2005) ("[A]lthough plaintiff may challenge the validity of the release because it is voidable as executed unknowingly and involuntarily under duress, he can only do so in the context of his ADEA claim unless he tenders back or puts in escrow the consideration he was paid in securing the release.").[5]

---

[5] Plaintiffs offer half-hearted attempts to distinguish four of the above cases by arguing that those cases rest on aspects unique to the particular state. None of Plaintiffs' alleged distinctions have any bearing on the points for which those cases are cited in this Memorandum.

"A federal court under Erie is bound to follow state law as announced by the highest state court" when applying the state's common law or statutory law.  Edwards v. HOVENSA, LLC, 497 F.3d 355, 361 (3d Cir. 2007); see also DeRasmi v. McDonnell Douglas Truck Servs., Inc., No. Civ.A.87-1332, 1989 WL 201013, at *1 (D.N.J. Jan. 30, 1989) ("When exercising pendant [or diversity] jurisdiction over a state common law claim, a federal court must generally follow the substantive state law of the state in which it sits.")  Thus, while federal courts are free to determine that state tender-back and/or ratification doctrines do not apply to a plaintiff's attempt to avoid a release that waives federal law claims, that discretion does not exist when determining whether those doctrines apply to a plaintiff's attempt to avoid a release that waives state law claims.  Defendants have adequately demonstrated—and Plaintiffs have not disputed—that Tennessee law requires require tender back of consideration where a plaintiff seeks to bring state law claims that are otherwise barred by a release.  They have also established that Tennessee law will generally find ratification where the plaintiff has failed to return or offer to return that consideration in a timely manner.  Simply because federal law does not require Plaintiffs, in this case, to return the consideration associated with the waiver of their ADEA and ERISA claims as specified in the Release does not mean this Court can freely disregard the state tender-back requirement with respect to Plaintiffs' state law claims.

## 2.   Whether Ratification Occurs Because of Plaintiffs' Non-Tender Back

Plaintiffs next assert that the mere fact that they have not returned their consideration does not automatically result in a ratification of the Release.  This proposition is premised on a compilation of various arguments, none of which the Court finds convincing.

First, Plaintiffs assert that a valid release never existed the Release because the elements

of voluntariness, assent, lack of duress, and lack of unconscionability were absent.  In other words, Plaintiffs assert that the Release was void, not voidable, and thus could not be made valid simply through the non-return of consideration.  "A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance."  Restatement (Second) Contracts § 7 (1981).  A "void" contract, on the other hand, is "[a] promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor."  Id. § 7 cmt. a.  A void contract is not subject to ratification.  Woolridge v. McFadden, 16 Beeler 613, 616 (Tenn. 1944) ("It is rudimentary that a void contract, having no existence in law, cannot be legalized by any subsequent ratification.").

None of Plaintiffs' challenges to the Release, however, would render the document void such that it could not be ratified.  Allegations of both duress by economic coercion and fraud—which would affect voluntariness and knowledge respectively—simply render a release voidable.  See Cumberland & Ohio Co. of Texas, Inc. v. First Am. Nat'l Bank, 936 F.2d 846, 850 (6th Cir. 2001) (applying Tennessee law and holding that "[a] contract signed under economic duress is voidable by the victim, not void") (citing Restatement (Second) of Contracts §§ 175 & comment d, 176 & comment a (1981)); Jack Mann Chevrolet Co. v. Assoc. Inv. Co., 125 F.2d 778, 784 (6th Cir. 1942) ("[W]here the release was procured by fraud, . . . such a release is not void but merely voidable.").  Likewise, although neither party cites a Tennessee case on point, "[i]t is generally accepted that an unconscionable contract is voidable because a contracting party has the power to validate or ratify the contract as well as to avoid it.  James River Mgmt. Co., Inc. v. Kehoe, No. Civ.A.09-387, 2010 WL 431473, at *3 (E.D. Va. Feb. 5,

15

2010); McMahon v. Eke-Nweke, 503 F. Supp. 2d 598, 603 (E.D.N.Y. 2007) ("If a contract is

unconscionable it is voidable; but it can be ratified.") (citing King v. Fox, 7 N.Y.3d 181, 191

(2006)); Hill v. Hill, 380 S.E.2d 540, 545 (N.C. Ct. App. 1989) ("[A]s with any contract, a

property settlement agreement which is unconscionable or which was procured by fraud, duress,

or undue influence will not be enforced by the courts, unless it is later ratified."); see also 8

Williston on Contracts § 18.1 (4th ed.) (describing the "traditional rule" that unconscionable

agreements may not be enforced at equity by the party who dictated the unconscionable terms).

Second, Plaintiffs contend that "for those plaintiffs who received 'severance,' it would be

impossible for them to discern how much was related to a non-compete, how much was related

to a non-solicitation, how much was related to federal claims, and how much, if any, was related

to state claims.  And if that amount could even be divined, the logical result would be, at that

time, to tender such amount to the court."  (Pls.' Resp. Opp'n Mot. Dismiss 4.)  As set forth

above, however, even where a plaintiff has received consideration for waiver of both federal

claims—which are not subject to tender back—and state law claims—which are subject to tender

back—the plaintiff must tender back the entire amount of consideration.

More importantly, while this argument may have had significantly more merit had it been

raised previously, it does not hold muster at this juncture.  Tennessee adheres to the "tender

rule," which recognizes that tendering back the consideration received is a condition precedent to

the right to repudiate the settlement agreement.  See Dobbins v. Dabbs, No. Civ.A.2006-00322,

2007 WL 187960, at *9 (Tenn. Ct. App. Jan. 25, 2007); Memphis St. Ry. Co. v. Giardino, 92

S.W. 855, 857 (Tenn. 1906) ("[I]t is the law of Tennessee that in an action to disaffirm a contract

or agreement on the ground of fraud that party seeking to disaffirm and repudiate must do so

16

promptly, and pay or tender back the consideration received as a condition precedent to his right to recover."). Undoubtedly, the structure of Allstate's Program with its added Release component raises complex issues of consideration. Nonetheless, at no point did Plaintiffs make any offer to tender back any portion of the consideration. Had they done so, the Court could have either obtained an agreement between the parties regarding what portion of the foregoing consideration would be sufficient to satisfy tender-back or, alternatively, determined that pre-judgment tender-back was unworkable in the context of the case. Plaintiffs, however, deprived both Defendants and the Court of that opportunity. By retaining the consideration they received while they instituted suit, Plaintiffs ratified the agreement. Thus, Plaintiffs' concern as to what amount or type of consideration to return is no longer an issue.

Third, Plaintiffs assert that "even if the failure to return money *could* breathe life into an otherwise still-borne contract, 'avoidance' can occur by means other than money-return." (Pls.' Resp. Opp'n Mot. Dismiss 5.) They go on to argue that the cases cited by Defendants did not find ratification simply by nature of the plaintiffs' failure to return money, but by the plaintiffs continuing to operate under the allegedly voidable agreement. See Cumberland & Ohio v. First Am. Nat'l Bank, 936 F.2d 846, 850 (6th Cir. 1991) (passage of length of time without any letter from the party seeking to repudiate plus retention of money, which prevented an argument of repudiation); Crocker v. Schneider, 683 S.W.2d 335, 340 (Tenn. Ct. App. 1984) (holding that passage of twenty-two months after the alleged duress during which plaintiff chose to operate under the written agreement, plus plaintiff's retention of consideration, constituted ratification). By contrast, Plaintiffs in this case assert that they repudiated, and thus avoided, the Release by taking legal action as part of the Romero class, regardless of whether or not they returned the

17

money.

Plaintiffs' argument is mistaken.  While the foregoing cases may have involved other acts of ratification aside from the failure to tender back, none of them dispel the clear rule recognized by the Tennessee Supreme Court that "the correct principle is that [consideration] must be paid or tendered so soon as the accord and satisfaction is sought, by the pleadings, to be avoided and repudiated; and that it is a condition precedent to the right of the plaintiff to proceed with his suit that he make such tender or payment when he asks the court to set aside the agreement." Memphis St. Ry. Co., 92 S.W. at 858; see also Dobbins, 2007 WL 187960, at *9.  Given this well-established notion, Plaintiffs' mere act of bringing suit on the Release is insufficient, absent tender back or an offer of tender back, to repudiate the Release.

### 3.  Whether Defendants Are Really Arguing for a Novation Rather Than a Ratification

In a last ditch argument to avoid the ramifications of their failure to tender back consideration, Plaintiffs argue that "[a]lthough Defendants use the 'ratification' terminology, Defendants are really arguing that the Release is a new contract which takes the place of the Plaintiffs' Contracts of Employment (the R830 and R1500)."  (Pls.' Resp. Opp'n Mot. Dismiss 6.)  They go on as follows:

> This would be considered a "novation," that is, a substitution of the old contract. Inghram v. Universal Indus. Gases, Inc., 2006 WL 306650, at *7 (E.D. Tenn. 2006). But under Tennessee law, novation requires four elements: (1) a previous valid contract; (2) an agreement supported by evidence of the parties' intention to work a novation; (3) extinguishment of the previously valid contract; and (4) a new, valid contract."  Central State Bank v. Edwards, 111 S.W.2d 873, 880 (Tenn. Ct. App. 1937).  Defendants bear the burden of "clearly showing" a novation.  Bank of Crockett v. Cullipher, 752 S.W.2d 84, 89 (Tenn. Ct. App. 1998).
>
> In this case, the Court has already determined, in Romero, that triable issues of duress and unconscionability exist.  Accordingly, it cannot be said that Plaintiffs

intended a novation, or that the Release is "a new, valid contract."

(Id. at 6–7.)

Plaintiffs' attempt to completely rewrite Defendants' ratification argument is not well founded. Defendants obviously do not intend to argue that a novation occurred, such that the Release took the place of the Plaintiffs' previous employment contracts. Rather, Defendants assert that Plaintiffs' employment contracts were validly terminated under the Program, and that the Release was simply a waiver of employment-related claims that could arise in connection with that termination. Defendants go on to contend that although Plaintiffs now wish to repudiate that Release, they have failed to return the consideration they have received in exchange for signing that document. That failure has, in turn, effectuated a ratification of the Release's validity. Novation plays no part in Defendants' argument.

### 4.    Conclusion as to Tender Back and Ratification

Having completely disregarded Tennessee's well-established tender-back requirement, Plaintiffs must now be deemed to have ratified the agreement with respect to their state law claims. Notably, this ratification has no impact on Plaintiffs' federal law claims under the ADEA or ERISA given that tender-back and ratification cannot apply to releases that purport to waive such claims. Plaintiffs' state law claims of breach of contract and breach of fiduciary duty, however, have indeed been forfeited by Plaintiffs' ratification of the Release.[6]

### B.    Whether Plaintiffs' ERISA Section 510 Claims Fail Because They Are Barred by the Applicable Statute of Limitations

Defendants next seek to dismiss Plaintiffs' claims under Section 510 of ERISA as barred

---

[6] Having dismissed all the state law claims on grounds of ratification, the Court need not address Defendants' multiple other challenges to those claims.

19

by the statute of limitations.  While Defendants present a meritorious argument, the Court finds

that equitable tolling applies to a portion of the elapsed time.

The parties agree that because ERISA does not have its own limitations period, the statute

of limitations and applicable tolling rules are to be borrowed from the most analogous forum

state law claim.  Romero v. Allstate Corp., 404 F.3d 212, 220–21 (3d Cir. 2005).  In this case, the

most analogous state law claim to an ERISA Section 510 claim is wrongful discharge, which is

subject to a two-year statute of limitations.  See Anderson v. Consol. Rail Corp., 297 F.3d 242,

251–52 (3d Cir. 2002).  That two-year period is tolled when a plaintiff is an eligible class

member.  Nelso v. Cnty. of Allegheny, 60 F.3d 1010, 1012–13 (3d Cir. 1995) (citing Allesandro

v. State Farm Mut. Auto. Ins. Co., 409 A.2d 347, 350 n.9 (Pa. 1979)).  Moreover, the parties

agree that federal common law governs the date on which the statute of limitations began to run,

which, for purposes of Plaintiffs' Section 510 claims, is when Plaintiffs received their notices of

termination.  Jakimas, 485 F.3d at 778–80.

Applying these rules, it is undisputed that the Tabor Plaintiffs received notice on

November 10, 1999 that their employment with Allstate under their existing contracts would

terminate.  (Compl. ¶¶ 87–89.)  On August 1, 2001, following the passage of one year and 265

days, the Romero Complaint was filed, under which the Tabor Plaintiffs were eligible class

members, thereby tolling the statue of limitations for those Plaintiffs.  On October 6, 2014, the

Court denied class certification with respect to Plaintiffs' challenges to the Complaint, but,

notably, did not address the running of the statute of limitations as to the substantive claims of

the non-party, former employee agents of Allstate.  Shortly thereafter, on November 7, 2014, the

Romero Plaintiffs filed a motion seeking clarification from the Court on this point.  By way of

20

Order dated December 11, 2014, the Court then explained that the October 6, 2014 Order restarted the running of the statute of limitations for any current or former employee-agent of Allstate who wanted to challenge the validity of the Release in order to pursue substantive claims.  On December 22, 2014, the Romero Plaintiffs filed a Motion for Reconsideration of the Court's ruling.  During the pendency of that Motion, the Court put a stay in place on the statute of limitations.  Finally, on January 6, 2015, the Court confirmed that the October 6, 2014 Order did, in fact, recommence the running of the statute of limitations because employee agents were put on clear notice that their rights were no longer protected by the class, but held that the stay would remain in place until March 2, 2015.  On May 11, 2015, the Tabor Plaintiffs filed their Complaint.

Under purely mathematical calculations, the Tabor Plaintiffs' ERISA § 510 claims are indeed time-barred.  As noted above, one year and 265 days passed from the day the Tabor Plaintiffs were put on notice about the termination of their contracts.  The statute of limitations then resumed running on October 6, 2014, when the Court denied class certification as to the Release issues.  Thereafter, another seventy-seven days elapsed between class certification denial on October 6, 2014 and the Court's December 22, 2014 Order staying the running of the statute of limitations, making it a total lapse of one year and 342 days.  Subsequently, another seventy days elapsed between the resumption of the statute of limitations on March 2, 2015, and the filing of the Tabor Complaint on May 11, 2015, for a total of two years and forty-seven days—forty-seven days past the expiration of the statute of limitations.

The inquiry, however, does not end at this juncture, as the Tabor Plaintiffs request that the Court equitably toll the statute of limitations.  Equitable tolling stops the statute of limitations

21

from running when the date on which the claim accrued has already passed.  Lake v. Arnold, 232

F.3d 360, 370 (3d Cir. 2000).   Equitable tolling of statutes of limitation "may be appropriate: (1)

where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2)

where the plaintiff in some extraordinary way has been prevented from asserting his or her rights;

or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum."

Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994);  see also

Miller v. N.J. State Dep't of Corr., 145 F.3d 616, 618 (3d Cir. 1998) (holding that equitable

tolling is an appropriate remedy when principles of equity would make a rigid application of the

statute of limitations unfair). The plaintiff has the burden of establishing that the equitable tolling

doctrine applies.  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 591 (3d Cir. 2005).

     While the Court remains somewhat hesitant to apply equitable tolling given the lengthy

history of this case, the Court finds that extraordinary circumstances weigh in favor of its

application.  As noted above, as of October 2014, the Romero case had been pending for over

thirteen years, during which time the matter had been proceeding as a putative class action.

Under mandate from the Third Circuit, the parties have been in the unusual procedural posture of

litigating only the Release issues in this case, without any attention thus far being given to the

substantive claims.  On October 6, 2014, the Court denied the Romero Plaintiffs' Motion for

Class Certification, which dealt solely with those issues regarding the validity of the Release.  As

the ruling was simply a denial of class certification as to the particular questions raised, the Court

made no comment as to that ruling's effect on the statute of limitations with respect to non-

parties who had signed a Release and wanted to pursue substantive claims.  The Court

acknowledges, in hindsight, that, given the already confusing legal landscape, neither current

class counsel nor the Tabor Plaintiffs—who were as of yet unrepresented—would have necessarily understood that the October 6, 2014 Order meant that they were no longer under the protection of the class for purposes of their substantive claims. Class counsel thus appropriately sought clarification from the Court as to whether the Order was intended to preclude later class certification on the substantive issues and whether the Order had any effect on the statute of limitations for non-party individuals. At that juncture, the Court fully considered the legal impact of this Order in light of the American Pipe tolling rules for class actions. On December 11, 2014, the Court issued an Order putting putative class members on unequivocal notice that "the Court's Order of October 6, 2014 restarted the running of the statute of limitations for any current or former employee-agent of Defendants who—between November 10, 1999 and June 30, 2000—signed the Release prepared by Defendants in connection with the Preparing for the Future Group Reorganization Program, and who now wishes to challenge the validity of that Release *by way of a Declaratory Judgment action* in order to pursue substantive claims against Defendants that would otherwise be contractually barred." (Romero v. Allstate, No. Civ.A.01-3894, Docket No. 486 (emphasis in original).) Upon receipt of that Order, the Tabor Plaintiffs acted with reasonable diligence to preserve their rights. A necessary period of communication occurred between class counsel and the putative class members in order to inform them of the impact of the Court rulings, update them on motions for reconsideration, and indicate whether class counsel would take on more individual representations. Thereafter, upon learning that current class counsel was taking on no new clients, the Tabor Plaintiffs faced the task of organizing themselves and finding counsel who then needed to inform themselves of the past thirteen years of litigation. Given these extraordinary circumstances and Plaintiffs' diligence in

bringing their claims, the Court finds that equitable tolling should apply to the closed period between October 6, 2014 and December 11, 2014.[7]

In light of this ruling, the elapsed time must be re-calculated.  As noted above, Plaintiffs were forty-seven days past the statute of limitations in filing their Complaint.  Removing the sixty-six days during which the Court equitably tolls the statute of limitations, Plaintiffs actually filed their Complaint nineteen days prior to the end of the statute of limitations.  Defendants have identified no prejudice that they would suffer by allowing the ERISA claims to proceed, nor does the Court find any such prejudice, particularly in light of the fact that hundreds of other Plaintiffs will be proceeding on an identical claim.  Thus, the Court declines to dismiss the Tabor Plaintiffs' ERISA § 510 claims.

### C.      Whether Plaintiffs' Claims Under ERISA § 204(g) Fail to State Claims Cognizable Under that Section

Finally, Allstate asserts that Plaintiffs' claims under Section 204(g)(2) of ERISA fail because Plaintiffs have not pled that the challenged plan amendments reduced or "cut-back" an already accrued benefit, as opposed to a prospective benefit.  Specifically, Counts VIII and IX of the Complaint allege as follows:

> COUNT VIII
> CUTBACK OF "BEEFED UP" EARLY RETIREMENT BENEFITS IN VIOLATION OF 29 U.S.C. 1054(g)(2) (On behalf of ERISA 204(g)(2) Plaintiffs Against Allstate)
>
> 181.    All Plaintiffs eligible for the "beefed up" early retirement benefits (the ERISA 204(g)(2) Plaintiffs) restate and reallege the allegations contained in

---

[7]  Plaintiffs argue that equitable tolling should extend until the Court's December 22, 2014 Order imposing a stay.  By December 11, 2014, however, employee agents had a clear ruling that the statute of limitations resumed running and should have begun taking steps to protect their rights.

paragraphs 1 to 130 of this Complaint as though set forth fully here.

182. Under the Pension Plan (prior to the unlawful and invalid November 1991 amendments), any employee agent who completes twenty (20) years of continuous services with Allstate is entitled to received "beefed up" early retirement benefit upon reaching age 55.

183. In purporting to adopt the November 1991 amendments, and in "readopting" such amendments in December 1994 (retroactively to November 1991), Allstate purported to phase out and ultimately eliminate these "beefed up" early retirement benefits by December 31, 1999.

184. By amending the Pension Plan to phase out and eliminate "beefed up" early retirement benefits for the agents who have met (after the Beef-Up Amendment) or may in the future meet the pre-amendment eligibility requirements for early retirement, Allstate caused the Pension Plan to violate the "anti-cutback" rule embodies [sic] in 29 U.S.C. § 1054(g)(2).

. . .

COUNT IX
CUTBACK OF EARLY RETIREMENT BENEFITS IN VIOLATION OF 29 U.S.C. § 1054(g) (On Behalf Of the ERISA Converted Agent Plaintiffs Against Allstate)

185. All ERISA Converted Agent Plaintiffs restate and reallege the allegations contained in paragraphs 1 to 130 of this Complaint as though set forth here in full.

186. Each of the ERISA Converted Agent Plaintiffs provided compensated service to Allstate as an "employee agent" under an R830 or R1500 contract prior to July 1, 2000.

187. Upon the termination of their employment contracts as part of the Program, each of the ERISA Converted Agent Plaintiffs continued to provide compensated service to Allstate as an "exclusive agent independent contractor" pursuant to an R3001S contract.

188. Under the Pension Plan, any employee agent who completes twenty (20) years of "service" with Allstate and who attains the age of 55 is entitled to receive early retirement benefits in the event he or she retires before reaching normal retirement age.

189. Under Allstate's own interpretation of the Pension Plan (as well as its interpretation of the November 1991 amendments to that plan), and under section 402(e) of the Internal Revenue Code, any converted agent of Allstate who provides any kind of compensated service to Allstate following the termination of his or employment contract with Allstate remains "in the service of Allstate" for purposes of determining eligibility or early retirement benefits.

190. The express terms of the Pension Plan (prior to the unlawful and invalid amendments discussed in [sic] above (the "Amendments")) state that "[a]ll

25

service" with Allstate "shall count as Credited Service." Accordingly, under the Pension Plan, any employee agent of Allstate who converted to Exclusive Agent, and thus continues to provide compensated "service" to the company under a contract creating an "exclusive agent independent contractor" relationship, continues to accumulate "service" under the Pension Plan for purposes of determining eligibility for early retirement benefits.

191. Under the Amendments to the Pension Plan, Allstate purported to alter the eligibility requirements in their capacity as Allstate-classified "employees" toward the fulfillment of those requirements and excluding any "service" they provided to the company as a so-called "exclusive agent independent contractor."

192. In imposing requirements that made it more difficult for participants to meet the eligibility requirements for obtaining early retirement benefits under the Pension Plan, the Amendments violated the "anti-cutback" rule embodied in 29 U.S.C. § 1054(g)(2).

193. Alternatively, even if "service" provided to Allstate as an "exclusive agent independent contractor" never counted as "service" for purposes of determining eligibility for early retirement benefits under the Pension Plan, the ERISA Converted Agent Plaintiffs are not truly "independent contractors." Since those plaintiffs began providing service to Allstate under the R3001S contract, Allstate has actually exercised at least as much control over the ERISA Converted Agent Plaintiffs as it did prior to the purported termination of their employment status and R830 or R1500 contracts. Accordingly, at all pertinent times, all of the ERISA Converted Agent Plaintiffs have been "employees" of Allstate within the meaning of 29 U.S.C. § 1002(6).

194. By amending the Pension Plan to no longer count all "service" which the ERISA Converted Agent Plaintiffs provide, for purposes of determining eligibility for early retirement, Allstate has caused the Pension Plan to violate the "anti-cutback" rule embodied in section 204(g) of ERISA.

(Compl. ¶¶ 181–94.) Allstate now contends that Plaintiffs' claims involve only "expected" benefits, but not "accrued" benefits, and thus do not state claims under § 204(g) of ERISA.

Section 204(g), known as the anti-cutback rule, "prohibits an employer from decreasing or eliminating a participant's accrued benefits by plan amendment." Bellas v. CBS, Inc., 221 F.3d 517, 522 (3d Cir. 2000). As amended, Section 204(g) states:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or

26

1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

(B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.  In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. . . .

29 U.S.C. § 1054(g).  Subsection (g)(1) sets forth a general prohibition against plan amendments which reduce accrued benefits.  Subsection (g)(2) provides that, under certain circumstances, a plan amendment which reduces early retirement benefits is to be treated as an amendment prohibited by subsection (g)(1)—*i.e.*, as a plan amendment which reduces accrued benefits.  Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1144 (3d Cir. 1993).  Thus, in order to state a claim for a violation of ERISA's anti-cutback rule, a plaintiff must show "(1) that a plan was amended and (2) that the amendment decreased an accrued benefit."  Battoni v. IBEW Local Union No. 102 Employee Pension Plan, 594 F.3d 230, 233 (3d Cir. 2010).

Allstate argues that Section 204(g) applies only to accrued benefits.  In this case, according to Allstate, the Plan amendments challenged in Counts VIII and IX are merely prospective limitations on expected benefits that might be earned at some time in the future.  In support of this argument, it cites a series of cases, none of which stand for anything more than the basic proposition that ERISA's anti-cutback provision protects against erosion of accrued benefits, not simply expected benefits, and none of which involve factual scenarios similar to the one at bar.  See Sunder v. U.S. Bancorp Pension Plan, 586 F.3d 593, 600 (8th Cir. 2009) (holding

that use of discount rate greater than the statutory rate set forth in the Internal Revenue Code (IRC) when calculating opening cash balances upon conversion of original fixed income defined benefit plan to a cash balance plan did not violate ERISA's prohibition on decreasing accrued benefits); Campbell v. BankBoston, N.A., 327 F.3d 1, 8–9 (1st Cir. 2003) (holding that "the December 31, 1996 amendment to the plan protected all of the pension benefit based on Campbell's work for the company up to that point; it merely ceased accruals under the old plan based on employment from that point forward.  This was an elimination of an expected, not accrued, benefit. There was no ERISA violation."); Beaston v. Sundt Cos., 804 F. Supp. 2d 1011, 1021 (D. Ariz. 2011) (holding that the plaintiff's right to have her employee stock ownership account remain in the defendant's stock until a certain date was not an accrued benefit); Hoffman v. Tharaldson Motels, Inc. Emp. Stock Ownership Plan, No. Civ.A.08-109, 2010 WL 749788, at *5 (D.N.D. Feb. 26, 2010) (noting that, under unequivocal regulations, an employer offering a plan which provides a participant upon termination "a single sum distribution in employer stock may modify the plan to provide the equivalent distribution in cash without violation of the anti-cutback provisions;" the expectation of the plaintiffs that the company stock would increase in value should the company be sold is not an accrued benefit, but rather an expectation not covered by the anti-cutback rule); Kerr v. Keogh, 345 F. Supp. 2d 35, 39 (D. Mass. 2004) ("[T]he 1995 Amendment did not have retroactive effect.  It changed the definition of a grace period prospectively, which is why Kerr *subsequently* experienced a break in service.  After the Amendment, Kerr could still have gone back to work as a pipefitter and avoided a break in service entirely.  The amendment could be considered retroactive only if the Board had declared that Kerr's *pre-Amendment* work created a break in service."); Saxton v. Central Pa. Teamsters

Pension Fund, No. Civ.A.02-986, 2003 WL 22952101, at *16 (E.D. Pa. Dec. 9, 2003) (holding that an amendment that reduced and eventually stopped future employer contributions to a retirement income plan was not covered by § 204(g) because these were only expected benefits and not accrued benefits; employees could not grow into those benefits).

In stark contrast to Allstate's broad argument, § 204's history and interpretive case law makes abundantly clear the fact that early retirement benefits, provided upon the satisfaction of certain age and/or service requirements, constitute accrued benefits protected by § 204(g).  The Third Circuit's "view of what constitutes an 'amendment' to a pension plan has been construed broadly to protect pension recipients."  Battoni v. IBEW Local Union No. 102 Emp. Pension Plan, 594 F.3d 230, 234 (3d Cir. 2010).  In the case of a defined benefit plan, ERISA characterizes, in somewhat circular fashion, an "accrued benefit" as a participant's "accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A).  Because early retirement benefits by definition commence prior to normal retirement age, those benefits were originally not considered "accrued" under ERISA prior to 1984.  See Bellas, 221 F.3d at 523 n.2 (citing Bencivenga v. Western Pa. Teamsters and Emp'rs Pension Fund, 763 F.2d 574, 577 (3d Cir. 1985)).  In 1984, however, Congress amended section 204(g) and extended the protection it afforded to early retirement benefits and retirement-type subsidies.  Bellas, 221 F.3d at 532.

Under the present state of the law, "unpredictable contingent event benefits that provide a benefit greater than the actuarially reduced normal retirement benefit are retirement-type subsidies, and therefore are accrued benefits under section 204(g), if the benefit continues beyond normal retirement age.  Such benefits are accrued upon their creation rather than upon the

occurrence of the unpredictable contingent event." Id.  As the Third Circuit has explained:

> While it is true that a plan participant may not be eligible to receive a shutdown benefit until the contingent event occurs, that circumstance by no means indicates that the value of that benefit has not been increasing over time in relationship to the participant's years of service under the plan, as in the case of a normal retirement benefit. The fact that a participant may not be eligible to receive payments until reaching the age of 65 does not mean that his or her retirement benefit does not accrue until the age of 65.  Rather, as is commonly accepted, and as defined in ERISA section 3(23), normal retirement benefits accrue over time prior to the date of eligibility.

Id. at 534.  The court conceded that "a plan sponsor could eliminate prospectively an early retirement benefit by amendment," but noted that "under section 204(g) the amendment could not adversely affect that portion of an early retirement benefit that already had accrued to a plan participant who satisfied the pre-amendment conditions for the benefit either before or after the amendment." Id. at 524.  Thus, if the amendments "reduced or eliminated early retirement benefits or retirement-type subsidies, the amendments would have had to allow employees who remained employed by [the company] after the amendments to 'grow into' the benefit." Id.  As more succinctly clarified:

> When § 1054(g) and § 1344 are read together, one finds that where a participant has qualified for an early retirement benefit prior to a termination or may thereafter qualify for that benefit by aging and giving additional service to the plan sponsor, the present value of the benefit has to be paid or set aside on termination.  On the other hand, where, at the time of termination, a participant has not qualified for such a benefit and will not be able to do so in the future because the opportunity to give service to the plan sponsor will not exist, nothing need be paid or set aside on termination with respect to the early retirement benefit.

Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1151–52 (3d Cir. 1993) (Stapleton, J., concurring and dissenting).

Numerous cases have since found that early retirement benefits which are contingent on

an employee reaching a certain number of years of service are accrued benefits for purposes of ERISA § 204(g).  See, e.g., Cottillion v. United Refining, 781 F.3d 47, 58 (3d Cir. 2015) ("There is no question but that a standard early retirement benefit, provided exclusively upon the satisfaction of certain age and/or service requirements, is an accrued benefit that is protected by" § 1054(g) (quotations omitted)); Ahng v. Allsteel, 96 F.3d 1033, 1036 (7th Cir. 1996) ("[A]s long as an employee satisfies, or will be able to satisfy, the eligibility requirements of the early retirement benefit in effect prior to the amendment, § 204(g) protects the benefit."  Because the plaintiff-employees could establish their eligibility to the pre-amendment requirements for early retirement benefit after the amendment, the amendment violated the anti-cutback rule.); In re Bakery and Confectionery Union and Indus. Int'l. Pension Fund Pension Plan, 865 F. Supp. 2d 469, 474 (S.D.N.Y. 2012) ("Eligibility for plaintiffs is based on a sum of their respective ages and lengths of service.  Because they can continue to age into pension benefits even after they have separated from their respective employers, Section 204(g) applies.  And because plaintiffs may, post-amendment, satisfy the pre-amendment requirements to obtaining a Plan C or Plan G pension, the anti-cutback rule bars the amendment."), aff'd 751 F.3d 71 (2d Cir. 2014); Abels v. Titan Int'l Inc., 85 F. Supp. 2d 924, 938 (S.D. Iowa 2000) (holding that amendment to pension plan which froze pension benefits as of certain date violated ERISA's anti-cutback provision, where provision was interpreted by employer/plan administrator so that employees' service after effective date of amendment would not count as part of their credited service for purposes of determining early retirement and retirement-type subsidies).

In the present case, the Complaint sets forth a sufficiently plausible claim that Allstate cut back subsidized early retirement benefits that fall within the ambit of § 204(g).  Count VIII

alleges that, under the Pension Plan prior to November of 1991, any employee agent who completed twenty years of continuous service with Allstate could receive "beefed up" early retirement benefit upon reaching age 55.  (Compl. ¶ 182.)  Undoubtedly, this Pension Plan provided a "benefit greater than the actuarial equivalent of the normal retirement benefit," and was to last beyond retirement age, meaning that it was an accrued benefit upon its creation for purposes of § 204(g).  Bellas, 221 F.3d at 525.  In November 1991, and again in December 1994, however, Allstate decided to phase out and ultimately eliminate the "beefed up" early retirement benefits by December 31, 1999.  (Id. ¶ 183.)  While Plaintiffs may not have been eligible to receive the "beefed up" benefits until they completed twenty years of service with Allstate and reached the age of 55, that fact did not mean that their entitlement to those benefits had not accrued over time relative to their age and years of service.  Thus, while Allstate could have phased out and eliminated those benefits for agents who had not yet begun working for Allstate as of the time of the November 1991 amendment, they could not deny Plaintiffs, who were employed before and remained employed after the amendments, the opportunity to "grow into" those benefits.  Accordingly, Count VII survives Rule 12(b)(6) scrutiny.

The same holds true with respect to Count IX.  Count IX alleges that under the Pension Plan prior to the amendments, any employee agent who completed twenty (20) years of "service" with Allstate and who attained the age of 55 was entitled to receive early retirement benefits in the event he or she retires before reaching normal retirement age.  (Compl. ¶ 188.)  According to Allstate's interpretation of the Plan prior to its amendments, creditable "service" included any time as either an employee agent of Allstate under a contract, or as an exclusive agent independent contractor of Allstate.  (Id. ¶¶ 189–90.)  The challenged Amendments, however,

purported to alter the definition of "service" to exclude any time spent as an exclusive agent independent contractor.  (Id. ¶ 191.)  As the Supreme Court has noted, the right to receive certain money on a certain date may not be affected by a condition imposed after a benefit has accrued. Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 746 (2004).  Thus, the Court finds that Count IX also sufficiently pleads a claim under ERISA § 204(g).[8]

## IV.   CONCLUSION

In light of the foregoing, the Court finds that Allstate's and Liddy's Motions to Dismiss must be granted in part and denied in part.  As to Plaintiffs' state law claims, the Court determines that Plaintiffs' failure to tender back or offer to tender back some or all of the consideration received for signing the Release now constitutes a ratification of that document with respect to those state law claims.  With respect to Plaintiffs' claims under § 510 ERISA, the Court agrees with Defendants that those claims are time-barred under a technical application of

---

[8]  Allstate argues that Plaintiffs' Opposition to the Motion to Dismiss fails to rebut Allstate's argument regarding Count IX's insufficient pleading of a violation of the anti-cutback rule.  They assert that such failure results in a concession by silence that this Amendment does not violate Section 204(g).

Allstate's argument completely ignores binding case law.  In a Rule 12(b)(6) motion, the burden of proof rests on the defendant to establish that the challenged cause of action fails to state a claim upon which relief may be granted.  In Stackhouse v. Mazurkiewicz, 951 F.2d 29 (3d Cir. 1991), the Third Circuit held that "if a motion to dismiss is granted solely because it has not been opposed, the case is simply not being dismissed because the complaint has failed to state a claim upon which relief may be granted.  Rather, it is dismissed as a sanction or failure to comply with the local court rule."  Id. at 30.  Thus, notwithstanding any local rule regarding the grant of unopposed motions, "a Rule 12(b)(6) motion should not be granted without an analysis of the merits of the underlying complaint."  Jones v. Unemployment Compensation Bd. of Review, 381 F. App'x 187, 189 (3d Cir. 2010).

In this case, Allstate has not proven that Count IX fails to state a claim upon which relief may be granted.  While Plaintiffs may have waived arguments they could have raised in opposition, they do not waive their claim simply by choosing to rest on a Complaint that sufficiently pleads that claim.

the statute of limitations, but nonetheless finds that the statute of limitations should be equitably tolled for the period between the Court's October 6, 2014 Order denying class certification and the Court's December 11, 2014 Order regarding the resumption of the statute of limitations.  A calculation of the lapse of time, with that tolled period removed, results in a determination that Plaintiffs' Complaint was timely filed.  Finally, as to Plaintiffs' causes of action under § 204(g) of ERISA, the Court holds that they adequately state claims upon which relief may be granted because the early retirement benefits were "accrued" benefits, as defined by controlling precedent.

An appropriate Order follows.

34